# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 11, 2014 Session

## STATE OF TENNESSEE v. BRIAN CASWELL MCGROWDER

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2012B1817    Mark J. Fishburn, Judge**

---

**No. M2013-01184-CCA-R3-CD - Filed September 23, 2014**

---

A Davidson County Criminal Court Jury convicted the appellant, Brian Caswell McGrowder, of statutory rape by an authority figure, a Class C felony, and aggravated statutory rape, a Class D felony. The trial court merged the latter conviction into the former and sentenced him to three years in confinement. On appeal, the appellant challenges (1) the trial court's refusal to grant a fourteen-day continuance after the court granted the State's motion to amend the superseding indictment, (2) the sufficiency of the evidence for statutory rape by an authority figure, (3) the trial court's failure to define "position of trust" for the jury, and (4) the State's commission of prosecutorial misconduct during its opening statement and closing arguments. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and JERRY L. SMITH, Sp. J., joined.

W. Justin Adams (on appeal) and Gina Crawley (at trial), Nashville, Tennessee, for the appellant, Brian Caswell McGrowder.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Sara Davis and Buki Baruwa, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

The appellant's charges resulted from his sexual relations with the minor victim. At

trial, the then twenty-year-old victim testified that she was born on November 3, 1991, and had a daughter who was born on October 16, 2009. The appellant was the father of the victim's daughter. The victim stated that in November 2008, she was seventeen years old and lived with her mother in Ashland Hills Apartments. The victim was in the eleventh grade and participated in her high school's Ombudsman program, which was designed for students with "attendance problems." The program required that its participants attend school from 7:00 a.m. to 10:30 or 11:00 a.m. and then work or perform community service from 11:00 a.m. to 2:15 p.m.

The victim testified that either the last week of November or the first week of December 2008, she began working in the call center at Market Strategies International. On her first day of training, she met the appellant, her training supervisor. During the introduction portion of the training, the trainees were required to state their names and reveal something about themselves. The victim told the group that she attended high school and that she was seventeen years old, and the appellant was present during the introductions. The victim said that because the appellant was her supervisor, she wanted to impress him and did not want to do anything in front of him that would make him think poorly of her. The victim said she thought the appellant was "in his early twenties, he told me he was like 23, in his early twenties."

The victim testified that one day during the second week of December 2008, she and a boy with whom she went to school needed a ride home and that the appellant offered to drive them. When the victim revealed where she lived, the appellant said that he also lived in Ashland Hills Apartments. Before they left work, the boy found a ride home; therefore, about 9:00 p.m., the appellant and the victim left work together and began the drive home. The appellant drove past the apartment complex and was "just riding around." As he drove back to the apartment complex, he asked the victim if she had "ever had sex with a grown man." The victim did not respond, and the appellant told her that if he was going to have a conversation with her, "[she] needed to be a grown woman, [and she] needed to respond when he [asked her] questions."

The victim testified that her relationship with her mother became strained and that her mother evicted her from their apartment sometime before Christmas. The victim told the appellant about the situation, and he said the victim could live with him, noting that he had a spare bedroom. The victim agreed and moved in with the appellant. She lived with him for approximately two and one-half weeks. During that time, they began having sexual intercourse. She thought the first time they had sex was during "the last two weeks of December, the first week of January." They had vaginal intercourse less than ten times, and the appellant did not wear a condom. The victim said she did not worry about not using protection because "I wasn't really having sex so I didn't think I could get pregnant." The

-2-

victim's mother occasionally telephoned to ask where she was, and the victim told her mother that she was at a friend's house.

The victim testified that about the first week of January 2009, the police came to Market Strategies, took her into the office, and told her that she was being taken into custody because her mother had reported her as a runaway. The victim telephoned the appellant and told him about the arrest, but he had no reaction. Thereafter, the victim returned to the appellant's apartment and stayed there for a few days; however, they did not resume their sexual relationship. The victim thought the appellant was fired shortly after she was taken into custody.

The victim testified that on February 14, 2009, she learned she was pregnant. The victim told her mother that she was pregnant and that the appellant was the father. The victim also told the appellant that she was pregnant, but he accused her of lying and demanded proof of the pregnancy. The victim showed him paperwork from her doctor, but he did not believe her, stating that she could have falsified the records. Afterward, the victim's relationship with the appellant ended, and she did not see him again.

The victim testified that she was afraid to have an abortion. Nevertheless, she worried about how she was going to support herself and the baby. She worked until the end of her pregnancy and continued going to school. After the baby was born, she went to the Department of Human Services (DHS) to obtain assistance for daycare. In order to authorize payment, DHS required that she identify the baby's father. However, the appellant had begged the victim not to seek child support and promised to help her financially with the baby's care, so she lied to DHS and claimed the baby's father was "Shawn Jones or somebody Jones." When the appellant did not provide the support, the victim identified the appellant as the baby's father, and DHS initiated child support proceedings against him. At first, the victim did not want the matter reported to the police because she thought the appellant was only twenty-three years old. However, a DHS worker informed the victim that the appellant was "[i]n his thirties, 34, 35" and that the relationship had to be reported because the victim was a minor and the difference between their ages was more than three years.

The victim testified that a paternity test confirmed the appellant as the baby's father and that she obtained a child support order against him. At some point, the police became involved, and the victim spoke with Detective Robert Carrigan. She said she was upset because the appellant was "old enough to be [her] dad." The victim again asserted that the appellant knew she was seventeen years old when they were having sex. She stated,

> I was trying to move out [of] my mom's house and I was trying
> to get another job, so he wrote me a resume and he like at the

bottom it said graduating class of -- or I was going to graduate in 2010, and he couldn't wait until I was 18 so we could be together . . . in public.

The appellant also drove her to high school occasionally.

The State asked the victim if the appellant ever told her not to tell anyone his age, and the victim responded, "Yes. He told me I should keep my mouth shut." The victim said that the appellant was not threatening her but that he was warning her that he could get in trouble. The State also asked, "[W]hen you were talking to him about helping you financially with the baby, did he ever threaten that he might even leave the country if you told anyone how old he was?" The victim answered that the appellant claimed he would "do what he had to do not to get in trouble." The victim said that she did not want to testify against the appellant and that she would not have reported their relationship to the police without DHS's intervention.

On cross-examination, the victim testified that she started working for Market Strategies the last week of November or the first week of December 2008 and that she had a two-week training period. The victim denied developing an interest in the appellant or leading him to believe she was eighteen years old. The victim said that when the appellant took her home the first time, he made inappropriate sexual comments to her. She did not go to the appellant's apartment at that time but did later when she did not have anywhere else to go. The appellant drove her home from work on two additional occasions. The victim said, "He wasn't acting strange, I just thought the questions that he [was] asking [were] weird."

The victim testified that after her mother "kicked [her] out," she did not contact the police or family members for help. She said she and the appellant occasionally slept in the same bed, stating, "I didn't want to sleep with him, it just happened." She asserted that the appellant did not force her to sleep with him.

The victim testified that after she began staying with the appellant, he allowed her to drive his truck and gave her money to buy food for both of them. She estimated that at least thirty people worked in the call center and could have seen her and the appellant together; however, they did not eat together at work and did not pass notes to each other.

The victim acknowledged that she did not like high school and was frequently tardy or absent. She also acknowledged that she missed days during December 2008 and January 2009 and that other days she served in-school or out-of-school suspension. Nevertheless, she maintained that the appellant drove her to school occasionally.

Regarding her relationship with the appellant, the victim testified that "I wouldn't say

-4-

I liked it" and that she was not upset when it ended. She said that the appellant's employment was terminated but that she was not the reason he was fired. She denied that the appellant confronted her about misleading him about her age. She also denied trying to rekindle the relationship after it ended. The appellant did not express interest in coming to the hospital when the baby was born, and he did not offer to help financially until the victim told him that she was going to seek child support. The appellant gave her money for the baby once and gave her Walmart gift cards twice. The victim acknowledged that while a parenting order was being negotiated, she told the mediator that the appellant "had fully supported the baby since birth." She explained that the appellant had asked her to lie so that he could avoid paying "back" child support.

The victim testified that she had occasionally left the baby with the appellant. One time when she picked up the baby, a woman was with the appellant. The victim became upset because the appellant had not seen the baby previously and because she did not want other women around the baby. The victim said that she saw the woman when the appellant opened the door "with the chain," that she cursed the appellant and the woman, and that she had to call the police in order to get the baby back because the appellant would not open the door. She acknowledged that when the police arrived, she took the baby and left "in a rage." She also acknowledged that she may have sent him a text message after the incident and said that she probably told him that she was "going to kill him . . . because [she] was upset about him not taking care of the baby." She denied wanting a relationship with the appellant but asserted that she wanted him to help support their child.

The victim testified that she did not know the appellant's age until she was informed by someone from DHS. She acknowledged that the appellant had shown her two identification cards in the past but said that she did not look at anything on the cards except the appellant's name and address. When she started staying at his apartment, she learned he had a child.

On redirect examination, the victim testified that she trusted the appellant when he became her training supervisor. When her mother evicted her, she did not think that any family members were viable options for help and believed that the appellant was her only option. The victim and the appellant did not publicize their relationship at work and deliberately did not eat lunch together.

On recross-examination, the victim testified that when she went to live with the appellant, she "didn't consider him a stranger." However, he had acted inappropriately toward her, and she had no romantic interest in him.

Maria Levinson, the Training and Quality Director at Market Strategies International,

testified that in November 2008, the appellant was responsible for training newly hired employees and monitoring quality control. During the "icebreaker" portion of the training, new employees were required to share their names and other information, which could include their ages. She said the training supervisors were always present during the introductory phase. The company required employees to be at least sixteen years old and frequently employed high school students.

Levinson testified that trainers were responsible for evaluating trainees to ensure they were meeting company standards. After one week, the trainers had to prepare progress reports, and another evaluation was performed at the end of the two-week training period. After the trainee "ma[d]e it to the floor," the trainer retained some authority over the trainee and could recommend that the trainee's employment be terminated. The victim began working at Market Strategies as an interviewer in late 2008. At that time, the appellant and Tammy Townsend were the only evening trainers.

On cross-examination, Levinson testified that as an employee, the appellant was "[a]lways positive, upbeat, always with a smile on his face." The victim began working on December 8, and her last day of training was about December 22. According to a form from Market Strategies, Juilo Mohanna was the victim's supervisor. On redirect examination, Levinson testified that an employee could have more than one supervisor with disciplinary authority over the employee.

Angela Booker, an eligibility counselor with DHS, testified that she was responsible for deciding whether an applicant was eligible for benefits, namely Medicaid, food stamps, or Families First. In order to qualify for the Families First program, an applicant was not required to receive child support but was required to reveal the name of the other parent so DHS could pursue child support actions. If the applicant refused to name the other parent, the applicant could not receive benefits.

Booker testified that in late August 2009, the victim applied for Medicaid and was approved. On November 3, 2009, the victim applied for Families First. Three days later, the victim reported to DHS that the father's first name was Shawn and that she did not know his last name. Because she failed to provide the father's name, she was deemed uncooperative and denied benefits. The next day, the victim revealed that the appellant was the father, and she was approved for Families First benefits.

Metro Nashville Police Detective Robert Carrigan testified that in December 2008, the victim's mother reported that the victim was a runaway. On December 30, the victim was arrested. In January 2010, Lee Ann Thornton, a child support employee, suspected that the victim had conceived a child while the victim was a minor and made a mandatory referral to

the district attorney's office. The case was referred to the police department, and Detective Carrigan was assigned to investigate.

Detective Carrigan testified that he learned DNA testing had established the appellant as the father of the victim's child. He also learned that the victim was seventeen years old when she became pregnant and that the appellant was thirty-six. The victim was born in November 1991, and the appellant was born in May 1972, making their age difference almost twenty years. Detective Carrigan stated that when he first interviewed the victim, she was reluctant to talk and "broke down crying" twice.

On cross-examination, Detective Carrigan testified that his records included an email written by Ms. Thornton on June 14, 2010, stating that the victim "told child support that she wanted to file rape charges against" the appellant. Detective Carrigan and another detective spoke with the victim at her home on June 23 and 24. The victim told Detective Carrigan that she was receiving child support payments but that she wanted to press charges against the appellant. Afterward, Detective Carrigan took the victim to night court where she signed an affidavit regarding the charges. On redirect examination, Detective Carrigan testified that, given the difference between the victim's and the appellant's ages, the appellant might have been prosecuted even if the victim had not wanted to press charges. At the conclusion of Detective Carrigan's testimony, the State rested its case.

Davonne Jinks testified that she worked for the Metropolitan Nashville Public School System as the court liaison in truancy cases. Jinks said school records reflected that the victim was suspended on December 8 through 11, 2008; January 9, 2009; and January 12 through 14, 2009. Additionally, the victim had unexcused absences on December 15, 2008, and January 8, 2009.

On cross-examination, Jinks testified that she could not determine from the records whether the victim went to the Ombudsman work site on the days of her suspension. The records reflected that the victim attended school some days in December 2008 and January 2009, that she was occasionally tardy, and that she served one day of in-school suspension on December 3, 2008.

The jury convicted the appellant of statutory rape by an authority figure and aggravated statutory rape. The trial court merged the convictions and sentenced him to an effective three years in confinement.

## II. Analysis

### A. Fourteen-day Continuance

The appellant contends that the trial court erred by failing to grant a fourteen-day continuance after the court allowed the State to amend the superseding indictment. The State responds that the appellant was originally indicted and notified of the accusations against him more than twenty-two months before trial and that he was given notice of the superseding indictment more than two weeks before trial; therefore, he is not entitled to relief. We agree with the State.

The record reflects that on September 24, 2010, a Davidson County Grand Jury indicted the appellant for statutory rape by an authority figure. The indictment provided that

> between the **1st** day of **January, 2009,** and the **31st** day of **January, 2009,** in Davidson County, Tennessee and before the finding of this indictment, [the defendant] did intentionally, knowingly, or recklessly engage in sexual penetration of [the victim], a person at least thirteen (13) but less than eighteen (18) years of age, the defendant is at least four (4) years older than the victim, and [he] was, at the time of the offense, in a position of trust, or had supervisory or disciplinary power over [the victim] by virtue of [his] legal, professional or occupational status and used the position of trust or power to accomplish the sexual penetration[.]

On July 6, 2012, the State filed a motion to amend the dates in the indictment to "'between the 1st day of November, 2008 and the 31st day of January, 2009.'"

On July 9, 2012, the State filed a superseding indictment charging the appellant with statutory rape by an authority figure and adding an alternative count of aggravated statutory rape. The aggravated statutory rape count alleged that the appellant

> between the **1st** day of **January, 2009** and the **31st** day of **January, 2009,** in Davidson County, Tennessee and before the finding of this indictment, did intentionally, knowingly, or recklessly engage in sexual penetration of [the victim], a person at least thirteen (13) but less than eighteen (18) years of age, and the defendant is at least ten (10) years older than the victim[.]

During a hearing on July 12, 2012, the State moved to amend the superseding indictment by changing the beginning date of the alleged offenses to December 1st, 2008. The trial court granted the motion and dismissed the original indictment.

During that same hearing, defense counsel advised the court that, due to the additional charge of aggravated statutory rape and the additional time period alleged in the amended superseding indictment, the appellant needed more time to prepare for trial. Regarding the additional charge, the trial court stated that aggravated statutory rape required the State to establish a larger age gap between the appellant and the victim and that "I just don't see how anything could ever change in respect to the additional charge that's been added because the dates of birth are what they are and they're never going to change." Regarding the State's amending the starting date of the offenses, the trial court found that the State's discovery materials had put the appellant on notice that some of the acts occurred in December and, therefore, that he was not prejudiced by changing the start date of the offenses to December 1. The trial court recognized that the "fourteen-day rule" generally entitled a defendant to fourteen days after the return of an indictment to prepare for trial. However, the trial court noted that on June 27, the State had informed defense counsel that it would move for an amendment of the indictment. Thus, the trial court stated,

> [S]o that's been an extra two weeks right there between the actual issuance of the indictment versus when you were placed on formal [verbal] notice of what she was going to be doing, so to the extent that there was any problems or changes that might occur, they would have to be so insignificant that that two-week period certainly allowed time to address those. Again, I don't see that there are any, because again, it's simply an issue of date of birth, that evidence is going to be presented anyway as to the differences in age. So, I'm going to respectfully deny the continuance and we'll be ready to proceed on Monday.

The trial began on July 16, 2012.

Tennessee Code Annotated section 40-14-105 provides that "[e]very person accused of any crime or misdemeanor whatsoever shall be entitled to fourteen (14) full days, Sundays and legal holidays excluded, after arrest and the return of the indictment or presentment before being tried for the offense." This court has explained that "the legislature intended that the delay between indictment and trial apply only where the indictment or presentment and arrest occur substantially at the same time." State v. Brown, 795 S.W.2d 689, 693 (Tenn. Crim. App. 1990) (citing Hood v. State, 216 S.W.2d 14 (Tenn. 1948); Dukes v. State, 578 S.W.2d 659 (Tenn. Crim. App. 1978)); see also Moultrie v. State, 584 S.W.2d 217, 219 (Tenn. Crim. App. 1978). This court will not overturn a trial court's ruling on a denial of a continuance unless the trial court has abused its discretion. See State v. Wilson, 164 S.W.3d 355, 362 (Tenn. Crim. App. 2003).

The trial court found that the amended superseding indictment essentially concerned the same time frame and facts as those alleged in the original indictment but added a charge concerning the difference between the appellant's and the victim's ages. The trial court also found that the State had verbally notified the defense about the superseding indictment at least two weeks before trial. As the State noted during the hearing, the purpose of its filing the superseding indictment was to add the alternative charge of aggravated statutory rape in the event the jury did not find the appellant acted as an authority figure, and the trial court noted that the convictions would merge. Moreover, the "essential question" is whether the error, if any, was prejudicial. Neal v. State, 334 S.W.2d 731, 733 (Tenn. 1960). During the hearing, the trial court repeatedly asked defense counsel to explain how the appellant was being prejudiced, and counsel was unable to give any specific examples. On appeal, the appellant also has not alleged any specific prejudice, and we can discern none. Therefore, we conclude that the trial court did not abuse its discretion by denying the appellant's request for a continuance.

## B. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his conviction for statutory rape by an authority figure because it fails to show that he was in a position of trust with the victim. In support of his argument, he notes that the victim did not testify that her relationship with him was analogous "to that between parent and child or an *in loco parentis* relationship like that of teacher and student, babysitter and child, or coach and child" or that she looked to him "for guidance, mentoring, or protection." The State argues that the evidence is sufficient because the appellant "would not have been able to initiate the relationship except through his 'position of trust.'" We agree with the State that the evidence is sufficient.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Tennessee Code Annotated section 39-13-532 provides as follows:

> (a) Statutory rape by an authority figure is the unlawful sexual penetration of a victim by the defendant . . . when:
>
> (1) The victim is at least thirteen (13) but less than eighteen (18) years of age;
>
> (2) The defendant is at least four (4) years older than the victim; and
>
> (3) The defendant was, at the time of the offense, in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual penetration; or
>
> (4) The defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual penetration.

According to the statute, the State is required to prove that at the time of the offense, the defendant was in a position of trust or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional, or occupational status; the State is not required to prove both. In the instant case, the jury specifically found the appellant guilty of statutory rape by an authority figure where the appellant was in a position of trust.

Our criminal code does not define "position of trust." Therefore, "we must rely on principles of statutory construction to ascertain [the] meaning." State v. Denton, 149 S.W.3d 1, 17 (Tenn. 2004). Generally, our courts glean "a statute's purpose from the plain and ordinary meaning of its language 'without forced or subtle construction that would limit or extend the meaning of the language.'" State v. Owens, 20 S.W.3d 634, 640 (Tenn. 2000)

-11-

(quoting Carson Creek Vacation Resorts, Inc. v. State Dep't of Revenue, 865 S.W.2d 1, 2 (Tenn. 1993)) (footnote omitted). In other words,"[w]hen statutory language is plain and unambiguous, [courts] must not apply a construction apart from the words of the statute." State v. Nelson, 23 S.W.3d 270, 271 (Tenn. 2000).

In State v. Denton, 149 S.W.3d 1, 17 (Tenn. 2004), our supreme court applied these same principles of statutory construction to the crime of sexual battery by an authority figure to determine whether the offense was intended to apply to the physician/patient relationship. 149 S.W.3d at 17-20. At that time, the statute provided that the defendant had "supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used such power to accomplish the sexual contact" but did not include that the defendant held a position of trust with the victim.[1] See id. at 17-18 (citing Tenn. Code Ann. § 39-13-527 (2003)). In holding that a physician does not exercise supervisory or disciplinary power over a patient merely from the physician's status as a doctor, the court noted that doctors hold a "position of great trust" with patients and that "a position of trust is not synonymous with a position of authority." Id. at 19-20. However, the court did not define "position of trust."

"Trust" is defined as "reliance on the integrity, strength, ability, surety, etc., of a person or thing; confidence"; "a person on whom or thing on which one relies"; "the obligation or responsibility imposed on a person in whom confidence or authority is placed"; or "charge, custody, or care." Random House Webster's Unabridged Dictionary 2031 (2d ed. 1998). "Trust" has also been defined as "'[c]onfidence in the integrity, ability, character, and truth of a person . . . [; s]omething committed into the care of another.'" People v. Secor, 664 N.E.2d 1054, 1059 (Ill. App. Ct. 1996) (quoting American Heritage Dictionary 1300 (2d coll. ed.).

Case law has addressed the abuse of a position of trust for the purpose of sentencing enhancement. See Tenn. Code Ann. § 40-35-114 (16) (listing that the defendant abused a position of public or private trust as an enhancement factor that a trial court may apply in criminal sentencing). For example, our supreme court has explained that a "court must look to 'the nature of the relationship,' and whether that relationship 'promoted confidence, reliability, or faith.' A relationship which promotes confidence, reliability, or faith, usually includes a degree of vulnerability." State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999) (quoting State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996)). Notably,

---

[1]In response to Denton, the legislature amended the statute for sexual battery by an authority figure to include "position of trust." See Tenn. G. Assemb., 104th G.A., 1st Sess., Judiciary Committee, House (Mar. 29, 2005, tape # 1) (statement of Representative Newton); see also Tenn. Code Ann. § 39-13-527(a)(3)(A) (2006). The offense of statutory rape by an authority figure was created in 2006.

[t]he position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith.

Kissinger, 922 S.W.2d at 488.

The court has also stated that "[w]here the adult perpetrator and minor victim are members of the same household, the adult occupies a position of 'presumptive private trust' with respect to the minor." Gutierrez, 5 S.W.3d at 645. This court has explained that "a personal relationship between the [appellant] and victim where the [appellant] acts as the victim's friend, paying for food and other items, is a sufficient basis for finding a private trust." State v. George William King, No. M2001-02026-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 979, at *17 (Nashville, Nov. 13, 2002) (citing State v. McKnight, 900 S.W.2d 36, 55 (Tenn. Crim. App. 1994)).

Taken in the light most favorable to the State, the proof shows that when the victim began working at Market Strategies International, the appellant was her training supervisor. The appellant lived in the same apartment complex as the victim and occasionally drove her home. On one particular occasion, the appellant asked the victim if she had ever had sex with a grown man, and the victim did not respond. Thereafter, the victim's mother evicted her from the family's apartment, and the victim confided in the appellant about her situation. The appellant offered to let the victim stay at his apartment, noting that he had a spare bedroom, and the victim agreed because she thought that she had nowhere else to go. Shortly thereafter, the appellant began having sex with the victim. The victim testified that she did not want to have sex with the appellant but that "it just happened." The appellant occasionally drove the victim to school, allowed her to drive his car, and gave her money for food. In other words, the record contains evidence from which a reasonable jury could conclude that he acted as her de facto caregiver. Therefore, we conclude that the evidence was sufficient for the jury to find that the appellant was in a position of trust with the victim and that the evidence is sufficient to support his conviction for statutory rape by an authority figure.

## C. Jury Instructions

The appellant contends that the trial court's failure to define "position of trust" resulted in reversible error. He contends that "a definition was necessary because 'position of trust'

is so ambiguous that it does not give adequate notice of the conduct proscribed by the statute." The State argues that the appellant waived this issue by failing to raise it during the trial. See Tenn. R. App. P. 36(a); see also State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996). The appellant replies that although he did not raise the issue at trial, he properly preserved the issue by raising it in the motion for new trial. We conclude that the appellant is not entitled to plain error relief.

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). We have previously noted that "[w]e must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). Generally, a charge "is erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). "In order to determine whether a conviction should be reversed on the basis of an erroneous instruction to the jury, this Court must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (citations omitted). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005).

Our supreme court has held that "[a]n erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection." Faulkner, 154 S.W.3d at 58; see also Tenn. R. Crim. P. 30(b) (providing that "[c]ounsel's failure to object [to the jury instructions] does not prejudice the right of a party to assign the basis of the objection as error in a motion for new trial"). The appellant urges this court to conclude that the failure to define "position of trust" rendered the charge erroneous, not incomplete, and therefore, that he did not waive the issue.

Generally, "[t]he material elements of the charged offense should be described and defined in connection with that offense." State v. Bowman, 327 S.W.3d 69, 93 (Tenn. 2009). The trial court instructed the jury:

> COUNT 1, STATUTORY RAPE BY AN AUTHORITY
> FIGURE; Any person who commits the offense of Statutory
> Rape by an Authority Figure is guilty of a crime.
>
> For you to find Brian Caswell McGrowder guilty of this
> offense, the State must have proven beyond a reasonable doubt

-14-

the existence of the following essential elements: (1) that he had unlawful sexual penetration of [the victim]; and (2) [the victim] was at least thirteen (13) but less than eighteen (18) years of age and he was at least four (4) years older than [the victim]; and (3) (a) that he was, at the time of the alleged unlawful sexual contact, in a position of trust, and used such position of trust to accomplish the sexual contact; or (b) that he had at the time of the offense, supervisory or disciplinary power over [the victim] by virtue of his occupational status and used such power to accomplish the sexual penetration; and (4) that he acted either intentionally, knowingly or recklessly.

Count one of the indictment alleges an act of statutory rape by an authority figure against [the victim], D.O.B. 11/3/91, refers to the following conduct: The defendant performed vaginal intercourse with the victim by placing his penis in the victim's vagina. This occurred at the defendant's home . . . and this contact occurred on the occasion of the conception of the victim's minor child[.]

"Sexual penetration" means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the alleged victim's, the defendant's, or any other person's body, but emission of semen is not required.

"Supervisory power" means the power to direct the actions of another.

"Disciplinary power" means the power to demand obedience through the use or threat of punishment."

"Victim" means the person alleged to have been subjected to criminal sexual conduct.

"Intentionally" means that the defendant acts with a conscious objective or desire to engage in the conduct.

"Knowingly" means that the defendant acts with the

-15-

awareness that his conduct is of a particular nature and that a particular circumstance exists.

"Recklessly" means that the defendant is aware of, but consciously disregards, a substantial and unjustifiable risk that the circumstances exist. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person could exercise under all the circumstances as viewed from the accused person's standpoint.

If you find from the proof beyond a reasonable doubt that Brian Caswell McGrowder is guilty of Statutory Rape by an Authority Figure as charged in Count 1, you will so report and your verdict in that event shall be "We, the Jury, find Brian Caswell McGrowder guilty of Statutory Rape by an Authority Figure."

The instruction contains every element of the statutory definition of the offense, see Tenn. Code Ann. § 39-13-532(a)(3), and it comports with the Tennessee Pattern Jury Instructions, see T.P.I.-Crim. 10.05(d). Granted, the instruction does not define "position of trust." However, this court has previously stated that when a trial court omitted part of the statutory definition of an offense, "[t]he instruction was not erroneous, it was just incomplete. Mere meagerness of the charge is not reversible error, in the absence of a special request for an additional charge." State v. Hayes, 720 S.W.2d 76, 85 (Tenn. Crim. App. 1986). Accordingly, we conclude that the appellant's challenge is not to an erroneous instruction but to an incomplete one. See State v. Young, 196 S.W.3d 85, 129 (Tenn. 2006). Thus, the appellant is entitled to relief only if plain error exists.

Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." See also Tenn. R. Evid. 103(d). We may only consider an issue as plain error when all five of the following factors are met:

a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to

-16-

do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'plain error must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

In this case, the instruction contained all of the elements listed in the statutory definition of statutory rape by an authority figure. Although the instruction did not define "position of trust," the instruction also did not fail to submit the legal issues fairly or mislead the jury as to the applicable law. Furthermore, while trial courts must describe and define the essential elements of each charged offense, they "are not required to define or explain words or terms in common use which are understood by persons of ordinary intelligence." State v. Ronald D. Correll, No. 03C01-9809-CC-00318, 1999 Tenn. Crim. App. LEXIS 990, at *16 (Knoxville, Oct. 8, 1999). "Trust" is a common term which jurors use and understand in their practical experience. Therefore, we are not convinced that the trial court's failure to define "position of trust" breached a clear and unequivocal rule of law.[2] Finally, we have already determined that the evidence is sufficient to support the appellant's conviction. As a result, consideration of the error, if any, is not necessary to do substantial justice, and the appellant is not entitled to plain error relief.

### D. Prosecutorial Misconduct

The appellant contends that the State committed prosecutorial misconduct during its opening statement and closing arguments. The appellant acknowledges that he did not make contemporaneous objections to the prosecutor's remarks, thereby waiving the issue. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was

---

[2]Nevertheless, we recognize that, under the particular facts and circumstances of a case, a trial judge may prefer to define "position of trust" for a jury. See State v. Ferguson, 2 S.W.3d 912, 917 (Tenn. 1999). Such an instruction may include the following language:

The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, you should look to see whether the defendant formally or informally stood in a relationship to the alleged victim that promoted confidence, reliability, or faith.

reasonably available to prevent or nullify the harmful effect of an error").[3] Nevertheless, he requests that we examine the issue for plain error. See Tenn. R. App. P. 36(b). We conclude that the appellant is not entitled to plain error relief.

Parties in criminal cases have the right "to make an opening statement to the court and jury setting forth their respective contentions, views of the facts and theories of the lawsuit." Tenn. Code Ann. § 20-9-301. "Opening statements 'are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove.'" State v. Sexton, 368 S.W.3d 371, 415 (Tenn. 2012) (quoting State v. Stout, 46 S.W.3d 689, 713 (Tenn. 2001)). Opening statements presenting a summary of the facts supporting a theory of the case are permissible "only so long as those 'facts are deemed likely to be supported by admissible evidence.'" Id. (quoting Stanfield v. Neblett, 339 S.W.3d 22, 41-42 (Tenn. Ct. App. 2010). Moreover, closing argument is an important tool for parties during a trial; therefore, counsel is generally given wide latitude during closing argument. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). However, "arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

In order to prevail on a claim of prosecutorial misconduct, the appellant must demonstrate that the prosecution's conduct was so inflammatory or improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); State v. Gray, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). In making this determination, this court is guided by five factors:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

---

[3]The appellant also did not include this issue in his motion for new trial. See Tenn. R. App. P. 3(e).

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

The appellant complains that during the State's opening statement, the prosecutor said, "Market Strategies International where the defendant is a training supervisor was the perfect setting for a person who has unusual [tastes] like Mr. McGrowder, a person that [likes] young girls." The appellant also complains about the following comments made during the prosecutor's rebuttal closing argument:

> He also knew based on that he likes to have sex with kids, but being a training supervisor in a place that employs a lot of 16 years olds and high school students is the perfect stomping ground for somebody like him. It's a great place to recruit those kids that you want to have sex with him and [the victim] was the perfect target, she had all those things going for her that a sex offender is looking for; bad family life, no direction, wants to be bigger than she is, no one to turn to, and he's in a position of supervisory authority over her.

There is no evidence in the record that the appellant was a "sex offender" who had any particular predilection for liking "young girls" or that he "likes to have sex with kids"; the evidence presented was that the appellant had a sexual relationship with the victim, who happened to be a minor. Accordingly, we conclude that the prosecutor intentionally misstated the evidence and appeared to be intentionally trying to prejudice the appellant. See State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998) (stating that using epithets to characterize a defendant is improper and has the potential to appeal to the "bias and passion of the jury"); State v. Stephen Louis Young, No. W2008-01885-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 42, at *9 (Jackson, Jan. 15, 2010) ("[T]he prosecutor's comment that the defendant was a 'pervert' was improper because a prosecutor should refrain from using epithets to characterize a defendant."). However, the trial court instructed the jury elsewhere during closing arguments and during the jury charge that opening statements and closing arguments were not evidence, and we generally presume that a jury has followed the trial

court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Moreover, the State's case against the appellant was strong. Accordingly, we hold that the prosecutor's statements did not rise to the level of plain error.

Next, the appellant complains about objections made by the State and that the State impermissibly commented on his failure to testify. During closing argument, defense counsel stated,

> How is that keeping a secret? "Oh, he said he couldn't wait until I turned eighteen," so I could take you to lunch into the public, but the relationship was already in public because Mr. McGrowder believed that she wasn't seventeen years old.
>
> . . . .
>
> And then later on that month, she did mention Mr. McGrowder's full name, and child support didn't indicate that they had any problems locating Mr. McGrowder, nothing about "we had to send him all these notices," nothing about that came in, they didn't have any problems at all locating Mr. McGrowder, and you know the reason why they didn't have any problems, no problems" Mr. McGrowder did nothing wrong. It was [the victim] who deceived him.

The State objected, arguing, "Your Honor, I'm going to object to facts not in evidence, that's the second time that the defense has stated that the defendant believed something, there's no testimony as to that, I'm going to ask that that be stricken." The trial court admonished the jury that the arguments of counsel were not evidence and that the jury was to render a verdict based upon the facts heard during trial.

Defense counsel later argued that "Mr. McGrowder was mistaken, he was mistaken, he thought that he could --[.]" The State interrupted, again objecting to defense counsel's referring to facts not in evidence. The court informed defense counsel, "You need to try and stick to the factual reasonable inferences that can be drawn therefrom." Defense counsel continued her closing argument, stating,

> Okay. Okay, Your Honor. You all can infer that based off [the victim's] testimony about her being dishonest at child support, about her being dishonest to you all, saying she never spoke to the police, being dishonest to you again saying I only rode with

-20-

him three times. I mean, she was dishonest about a lot. What else would [the victim] be dishonest about? What else?

During the State's rebuttal argument, the prosecutor stated as follows:

[Defense counsel] is making all kinds of insinuations, but that's not evidence. She can insinuate and insinuate and insinuate all she wants that the defendant believed something else, but there's no evidence of that. No one testified that the defendant didn't know how old [the victim] was. You have to use facts in evidence to make your decision, not accusations, allegations, smoke and mirrors.

. . . .

Mistake of fact is something that [defense counsel] says is a defense to all of those elements, this is true, you will be read something called a mistake of fact and whether or not it's a defense to this crime. If there is evidence put forth at trial that a defendant was mistaken about the facts, potentially it could be a defense. I would submit to you, ladies and gentlemen, there is no evidence that Mr. McGrowder [was mistaken about] the facts here, that he didn't know that [the victim] was [not] 18. The only person that says that was [defense counsel]. There's no witness that he didn't know how old she was. It's not in evidence.

. . . .

If you believe [the victim], you have to find him guilty. And how do we know she's telling the truth? Well, first of all, there's not facts in evidence otherwise, there's been no testimony that the defendant thought she was [eighteen].

The appellant contends that the State's objections were improper because defense counsel's closing argument was based on reasonable inferences from the facts in evidence and because the objections improperly referred to the appellant's failure to testify. He also contends that the State compounded the error by mentioning during its rebuttal closing argument that the appellant had failed to testify.

-21-

Regarding the State's objections, there was no direct evidence that the appellant thought the victim was eighteen years old. Nevertheless, defense counsel tried to show through cross-examination of the victim that the victim had deceived the appellant about her age. Therefore, in our view and in light of the fact that counsel is generally afforded wide latitude during closing arguments, the prosecutor's objections were improper. However, nothing indicates that the prosecutor's objections changed the outcome of the trial.

As to whether the prosecutor's objections and rebuttal closing argument improperly referred to the appellant's failure to testify, generally, it is constitutionally impermissible for a prosecutor to comment upon the accused's exercise of the right not to testify during the course of trial. See State v. Noura Jackson, ___ S.W.3d ___, No. W2009-01709-SC-R11-CD, 2014 Tenn. LEXIS 619, at **79-80 (Jackson, Aug. 22, 2014). However, we conclude that the State was not commenting on the appellant's failure to testify but instead was noting that its proof was uncontradicted. This court has held that "mere argument by the state that its proof is unrefuted or uncontradicted is not an improper comment upon a defendant's failure to testify." State v. Rice, 638 S.W.2d 424, 427 (Tenn. Crim. App. 1982); see also State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985). Moreover, given defense counsel's argument that the appellant believed the victim was not seventeen, the prosecutor's statements were a fair response to defense counsel's claim. See Noura Jackson, No. W2009-01709-SC-R11-CD, 2014 Tenn. LEXIS 619, at *81 (stating that prosecutorial responses to defense arguments are clearly permitted). Therefore, we conclude that the appellant is not entitled to relief.

Finally, the appellant contends that the prosecutor improperly vouched for the victim's credibility by stating during her rebuttal closing argument that statutory rape victims were unwilling witnesses, that the victim had to be "dragged into the courtroom" and "didn't want to be here," and that the victim had sex with the appellant because she "doesn't know how to say no or whether or not she want to say no or what to do." However, the prosecutor's statements were in direct response to defense counsel's argument that the victim was "a woman with a plan" and that the victim set out to punish the appellant for not loving her. Moreover, the victim testified that DHS had to report her relationship with the appellant to the police, that she would not have gone to the police without DHS's intervention, that she did not want to testify against him, and that she did not want to have sex with him but that "it just happened." Therefore, we conclude that the prosecutor's statements were not improper.

### E. Cumulative Error

Finally, the appellant contends that the cumulative effect of the errors at trial warrants a new trial. However, this claim has no merit.

### III.  Conclusion

In sum, we conclude that the trial court did not err by refusing to allow the appellant an additional fourteen days after the superseding indictment was filed to prepare for trial, that the evidence is sufficient to sustain his conviction for statutory rape by an authority figure, that he is not entitled to plain error relief based upon the trial court's failure to define "position of trust" for the jury, and that he is not entitled to plain error relief based upon the prosecutor's improper remarks during opening statements and closing arguments.  Therefore, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE